POSTAL TELEGRAPH-CABLE CO. v. INGRAHAM et al.

(District Court, D. Maine. December 11, 1915.)

No. 744.

1. TELEGRAPHS AND TELEPHONES ⬉10—USE OF STREETS—PERMITS.

Where a permit for the erection and maintenance of telegraph poles and wires in a street was not signed by the mayor and aldermen of the city, or a majority of them, but by the clerk in their behalf, any irregularity therein was made good by acquiescence in the use of the street for 25 years.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ⬉10.]

2. TELEGRAPHS AND TELEPHONES ⬉10—USE OF STREETS—PERMITS—"FRANCHISE."

A permit granted by the mayor and aldermen of a city for the erection of telegraph poles and wires in a street, and duly made use of, though granted without any legal consideration being paid therefor and in general terms without any limit, is not revocable at will, but constituted a franchise which is assignable, and could not be terminated or substantially modified, except for good cause. See Owensboro v. Cumberland Telephone & Telegraph Co., 230 U. S. 58, 33 Sup. Ct. 988, 57 L. Ed. 1389.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ⬉10.

For other definitions, see Words and Phrases, First and Second Series, Franchise.]

3. TELEGRAPHS AND TELEPHONES ⬉10—USE OF STREETS—POWERS OF CITY COUNCIL.

The reasonableness of an order of the mayor and aldermen of a city requiring telegraph wires to be placed underground may and should be

determined, not only by existing conditions, but by conditions the existence of which can be foreseen, or by reference to coming demands which are apparent.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. § 6; Dec. Dig. ☜10.]

In Equity. Suit by the Postal Telegraph-Cable Company against William M. Ingraham and others. Decree for complainant.

Woodman & Whitehouse and Arthur Chapman, both of Portland, Me., for complainant.

James A. Connellan, Corp. Counsel, of Portland, Me., for defendants.

PUTNAM, Circuit Judge. The respondents named herein are alleged to have been the mayor and aldermen of the city of Portland, and to have had general jurisdiction of the matters to which this bill relates. On the 2d day of August, 1915, the board of mayor and aldermen of the city of Portland passed the following order:

"City of Portland, Maine. In Board of Mayor and Aldermen.

"August 2, 1915.

"It is hereby ordered that all permits for the construction and maintenance of poles and wires upon the public highway and street known as St. John street, between Park avenue and Danforth street, heretofore issued and given by the municipal officers of the city of Portland to the Postal Telegraph-Cable Company, be and the same are hereby revoked, and the Postal Telegraph-Cable Company is hereby ordered to remove all said poles and wires now maintained or in process of construction upon said St. John street, between Park avenue and Danforth street. Said removal of said poles and wires to be made and completed within 60 days from the date of the granting of a permit to said Postal Telegraph-Cable Company to lay conduits for the carrying of pipes, wires, and cables under the surface on the easterly side of St. John street, between Park avenue and Danforth street; such laying of said conduits for the carrying of pipes, wires, and cables beneath the surface of the street to be subject to the approval of the commissioner of public works and to the city electrician of the city of Portland: Provided, said Postal Telegraph-Cable Company makes application for such permit within 7 days after the date of the passage of this order; and provided, that said poles and wires be entirely removed and said conduits for carrying said pipes, wires, and cables installed and completed within 60 days from the granting of said permit; and provided, further, that the first work done in the laying of said conduits for carrying the said pipes, wires, and cables be in the section of St. John street from the end of the present paving to the offices of the Maine Central Railroad now under process of construction. If the said Postal Telegraph-Cable Company does not make application for a permit to place their or its pipes, wires, and cables underground, and to install conduits for said pipes, wires, and cables underground, then said removal of said poles and wires must be made within 60 days of the date of the passage of this order. And the city clerk of the city of Portland is hereby authorized, directed, and instructed to have a certified copy of this order served upon the Postal Telegraph-Cable Company by service upon its Portland manager, agent, or representative on Tuesday, August 3, 1915, and if unable to make service as aforesaid by the use of reasonable diligence, then and in said event as soon thereafter as possible."

[1] The bill alleges that the erection of the poles and wires in question was authorized by a permit issued to the Commercial Union Telegraph Company on February 3, 1890, and this is admitted to have

been assigned to the complainant. This permit is not impugned by the answer to the bill, but seems to be now criticized by counsel. We understand that this criticism is on the ground that the act of 1885 (St. Me. 1885, c. 378, § 2) on which this permit is said to rest required permits of this character to be in writing, and signed by the mayor and aldermen. Neither the answer to the bill, nor the brief of counsel, point out specifically and clearly what the defect was in the proceeding of 1890. We understand it is that the permit then issued was not under the manual signatures of the mayor and aldermen then in office, or of a majority of them, but, like the major part of the proceedings of that board, was signed by the clerk in their behalf. We are not prepared to say that the rule, "Facit per alium, facit per se," applies to proceedings of this character; but any irregularity of such a nature must be held to have been made good by so long an acquiescence as we find here.

[2, 3] The fundamental question in the case, and the point on which the order of August 2, 1915, properly rests, is that until within a few years the general belief and impression of the legal profession has been that any permit which is granted without any legal consideration being paid therefor, and in general terms without any limit, was revocable at will. This has lately been found and determined by the Supreme Court of the United States not to be in accordance with the law, but these permits constitute a franchise which is assignable and which cannot be terminated, or substantially modified, except for good cause, or for some constitutional power, supported by some special reasons in favor thereof. A reference to Owensboro v. Cumberland Telephone & Telegraph Company, 230 U. S. 58, 33 Sup. Ct. 988, 57 L. Ed. 1389, decided in June, 1913, sufficiently illustrates what we refer to in this connection; and the decisions of the Supreme Court of the United States of late have contained numerous illustrations of the power of the Legislature with reference to imposing on quasi corporations the duties and the cost of contributing to the various improvements which are apparently required by developing modern necessities. With reference, however, to rights and requirements in either direction, a certain degree of reasonableness is demanded. With regard to the shifting of franchises like those involved here in the imposing of novel obligations and in the development of new rights and relations, the question of reasonableness is always determined by conditions already accrued and existing; but no doubt it may be determined, and should be determined, not only by existing conditions, but by conditions the existence of which can be foreseen in a growing city or town, or in special localities where the coming demands are apparent.

[4] The difficulty, however, with the order of August 2, 1915, in the present case, is that it takes no account of the propositions which we have explained. It is radical and substantial in its terms, and by its letter destroys what exists, and leaves in the place of it only a right to apply for new franchises. It is possible that, in view of all the circumstances, courts might construe the real purpose of the order in harmony with the principles and decisions to which we have

referred; but, as we are not clear that this will be done, the prudent course is to set aside the order of August 2, 1915, absolutely, and permit the institution of new proceedings, which can easily be accomplished.

The bill will be sustained; and the complainant may offer a draft decree within 10 days from the filing of this opinion, and the respondents may offer corrections thereof within 10 days thereafter.